NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRESHEY JOHNSON,<br><br>    Plaintiff,<br><br>v.<br><br>THE CITY OF PATERSON, OFFICER LEVIS QIRJAKO, in his personal capacity, OFFICER ELBRUZ DAGISTANLI, in his personal capacity,<br><br>    Defendants. | No. 21cv19907 (EP) (JSA)<br><br>**OPINION** |

**Evelyn Padin, U.S.D.J.**

Presently before the Court is Defendant City of Paterson's ("Paterson's") motion to dismiss all claims asserted against it by Plaintiff BreShey Johnson ("Johnson") under Federal Rule of Civil Procedure 12(b)(6).  D.E. 18.  The Court has reviewed the parties' submissions and decides the motion without oral argument.  *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the reasons stated below, Paterson's motion is **GRANTED in part** (as to Counts I and IV) and **DENIED in part** (as to Counts II and III).

**I.    BACKGROUND**[1]

    **A.  Factual Background**

This is a civil rights case brought by Johnson against Paterson and two Paterson Police Officers, Levis Qirjako and Elbruz Dagistanli.  Johnson asserts various claims against Defendants

---

[1] For the purposes of this Opinion, the Court accepts as true all of the complaint's well-pled factual allegations.

under 42 U.S.C. § 1983. Her factual allegations underlying her claims are as follows: Late on the night of March 11, 2020, Johnson and her ex-girlfriend "got into a disagreement inside her house." D.E. 13 at 1. The argument continued outside, and the ex-girlfriend's mother eventually called the Paterson Police Department to complain about Johnson's behavior. *Id.* Officers Qirjako and Dagistanli arrived at the scene after the argument ended, at the same time Johnson's Uber arrived. *Id.* Qirjako arrested Johnson at approximately 1:00am on March 12, 2020, as she attempted to get in to the Uber. Johnson avers that "[a]t no point did [she] resist arrest, physically or verbally threaten the officers, [or] attempt to flee." *Id.* at 2.

Johnson alleges that after she was transported to the police station, and while "[s]till in handcuffs, before processing, Officer Qirjako began swinging [her] by [her] arms into a wall and bench." *Id.* Johnson claims that Qirjako's actions against her were completely unprovoked. *Id.* She further claims that several officers witnessed this incident, and not one officer intervened to stop it. *Id.* at 3. Qirjako "bust[ed Johnson's] lip open [and] bruised [her] cheek bones/forehead and the rest of [her] face." *Id.* at 2. Johnson avers that she "suffered from swelling all over [her] body and [her] right arm was not fully functional for months," and, further, that she continues to experience "sharp pains in [her] right shoulder anytime [she] use[s] her shoulder for too long." *Id.* Johnson claims that every officer in the police station "ignored [her] obvious medical distress." *Id.* at 3."

Johnson alleges that she was thereafter placed in a holding cell in the police station "with a bleeding lip, mouth and no toilet paper," and remained there for approximately 5-6 hours. *Id.* at 2. During that time, Johnson "was denied medical treatment" and "[t]he officers refused [her] many request[s] for toilet paper," thereby "forc[ing Johnson] to sit with feces on [her] for hours." *Id.* Johnson was thereafter "transported to Passaic County," where her "bruises were immediately

2

noticed." *Id.* She was accordingly "sent to the medics at Passaic County and given medication as well as bags of ice for swelling." *Id.* On "[t]he day following [her] release from Passaic County[, Johnson] went to a CityMD for [her] pain." There, she "was diagnosed with head trauma, facial trauma and an arm injury. The doctor was [also] concerned [about a potential] facial fracture and [Johnson] was instructed to go the ER immediately." *Id.*

As noted, Johnson specifically avers that other officers in the precinct witnessed Qirjako's alleged use of excessive against her, and that all such officers refused to intervene. Johnson asserts that this fact "demonstrates unconstitutional customs, practices and a pattern of excessive force" that Paterson is liable for. *Id.* at 3. Johnson also points to several reports and additional statistics which purportedly bolster her claims against Paterson, specifically. First, she notes that "[a]nnual reports filed by the Paterson police department showed that the internal affairs division disposed of 93 excessive force complaints against city police officers from 2015 through 2019 and found that an officer did something wrong in one case, a rate of just about 1%." *Id.* Second, she notes that in the "three years prior to April 29, 2021, the U.S. Attorney obtained criminal convictions against at-least seven other Paterson officers." *Id.* And third, that a two-year audit of Paterson's police force completed by the Police Executive Research Forum in 2022 found that the "Paterson department had out of date procedures, command structure and policies, including use of force," and that "the department has issues with training and needs to improve its use of force policies." Johnson also avers that "Paterson failed to properly train or modify its training to Defendant Officers and its other officers, including but not limited to, matters related to the reasonable and appropriate use of force during [] arrests, and intervention in the excessive use of force by fellow officers." *Id.* at 4.

3

### B. Procedural History

Johnson initiated this action, *pro se*, on November 10, 2021. D.E. 1. On April 6, 2022, Johnson, still acting *pro se*, amended her pleading. D.E. 13. Johnson's amended complaint asserts four separate claims under 42 U.S.C. § 1983: (1) Fourth Amendment Violations, against all defendants; (2) *Monell* Liability, *i.e.*, that a municipal policy or custom was the moving force behind the injury, against Paterson only; (3) *Canton* Liability, *i.e.*, a *Monell*-rooted failure-to-train claim, against Paterson only; and (4) Eighth Amendment Violations, against all defendants. *Id.*

On May 6, 2022, Paterson filed its motion to dismiss all claims asserted against it pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 18. On July 18, 2022, Johnson, now represented by counsel, filed her opposition to that motion. D.E. 26. Paterson filed its reply on July 25, 2022. D.E. 28.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. However, the allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. As the moving party, the defendant bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9

4

(3d Cir. 2011). For the purposes of the motion, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

### III.   ANALYSIS

#### A.   42 U.S.C. § 1983, Generally

Johnson asserts claims pursuant to 42 U.S.C. § 1983, which, in relevant part, provides that "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

#### B.   Counts I and IV Are Dismissed Against Paterson

The Court, as an initial matter, will dismiss Counts I and IV of Johnson's complaint as against Paterson (insomuch as Johnson is even attempting to assert direct claims against Paterson by way of those two counts). Count I of Johnson's complaint asserts a claim for "Fourth Amendment Violations" and Count IV asserts a claim for "Eighth Amendment Violations." Although Johnson lists Paterson as a defendant in the heading of both counts, it is clear, upon a review of the substantive allegations therein, that both of these counts speak only to the specific actions committed by the individual officers that purportedly violated Johnson's constitutional rights. *See* D.E. 13 at 2-4. Indeed, Johnson does not discuss Paterson within Counts I and IV at all. *See id.* Importantly, Section 1983 liability cannot attach to a municipality or local governing body under a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Counts I and IV are accordingly dismissed as against Paterson.

### C. Johnson's *Monell*-Based Claims

The Court now turns its attention to the two Section 1983 municipal liability claims which Johnson specifically asserts against the City of Paterson: Count II (*Monell* Liability, *i.e.*, Johnson's custom or policy claim) and Count III (*Canton* Liability, *i.e.*, Johnson's failure-to-train claim). A municipality may be liable under Section 1983 "if the plaintiff identifies a municipal 'policy' or 'custom' that was the 'moving force' behind the injury." *Jewell v. Ridley Township*, 497 F. App'x 182, 185 (3d Cir. 2012) (quoting *Monell*, 436 U.S. at 694). A policy exists "when a decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007) (internal quotation and alteration omitted). A custom may be established "by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* at 155-56 (internal quotation omitted).

For a policy or custom claim, in addition to pleading that a policy or custom inflicted the injury in question, a plaintiff must also allege that the policy or custom was the proximate cause of his injuries. *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citations omitted) (explaining that "[a]lthough a policy or custom is necessary to plead a municipal claim, it is not sufficient to survive a motion to dismiss"). To do this, a plaintiff must demonstrate an "affirmative link" between the policy or custom and the particular constitutional violation he alleges, such as where the plaintiff shows that the municipality "had knowledge of similar unlawful conduct in the past, . . . failed to take precautions against future violations, and that [its] failure, at least in part, led to [his] injury." *Id.* (quotations and citation omitted). A plaintiff does not need to identify a responsible decisionmaker in his pleadings, and a plaintiff is not required to prove that the custom had the municipality's formal approval. *Id.* (citation omitted).

A Section 1983 municipal liability claim may also be premised on a municipality's failure to properly train, supervise, or discipline its employees. *See Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) ("[I]n the absence of an unconstitutional policy, a municipality's failure to properly train its employees and officers can create an actionable violation . . . under § 1983."). To plead such a claim, a plaintiff must demonstrate that a city's failure "reflects a deliberate or conscious choice." *Roman*, 914 F.3d at 798 (3d Cir. 2019) (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001)). For claims involving police officers, the alleged failure can only serve as a basis for Section 1983 liability where it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019) (explaining that a *Monell* claim that is "predicated on a failure or inadequacy has the separate, but equally demanding requirement of demonstrating a failure or inadequacy amounting to deliberate indifference on the part of the municipality").

Deliberate indifference is plausibly pled by showing that "(1) municipal policy makers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Roman*, 914 F.3d at 798 (quoting *Doe v. Luzerne County*, 660 F.3d 169, 180 (3d Cir. 2011) (internal brackets omitted)); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."). "'Deliberate indifference' is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action . . . Ordinarily, a pattern

of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (internal quotations, citations, and brackets omitted); *accord Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").

### a. *Estate of Roman v. City of Newark*

The Third Circuit in *Roman* used these guidelines to assess the pleading sufficiency of the plaintiff's *Monell*-rooted policy or custom and failure-to-train claims against the City of Newark. *Roman*, 914 F.3d 789. The Third Circuit found that the plaintiff had not pled an unconstitutional policy because his complaint failed to refer to an official proclamation, policy, or an edict. *Id.* at 798. The Third Circuit found, however, that the plaintiff sufficiently pleaded a claim for an unconstitutional custom, as well as a claim that Newark failed to train, supervise, and discipline its officers. *Id.* at 799.

In addition to alleging that Newark had "a pattern or practice of constitutional violations in areas including . . . arrest practices," and that Newark "had notice of this practice, as it received complaints against officers accused of . . . conducting improper searches and false arrests," the complaint referred to a press release, a newspaper article, and a consent decree. *Id.* Those documents collectively provided that Newark was under the supervision of a federal monitor after the plaintiff's arrest, and that the monitor would oversee reforms in several areas, including searches, arrests, and the intake and investigation of misconduct complaints. *Id.*

More specifically, the consent decree covered the same type of conduct the plaintiff alleged, as it prohibited officers from relying on information known to be materially false or incorrect to justify a warrantless search or to effect an arrest, mandated officers to collect data on

8

consent, the type of search, and a brief description of the facts creating probable cause, and required the police department to investigate police misconduct with special emphasis on allegations of criminal misconduct, false arrest, planting evidence, and unlawful searches. *Id.*

The newspaper article and the consent decree also provided factual support to the plaintiff's failure-to-train claim, as the head of Newark's police union conceded the last training he received was in 1995, when he first joined the Newark Police Department. *Id.* at 799-800. The consent decree further indicated that Newark police officers in general were not trained on the requirements of the Fourth Amendment and related law, touched on supervisory review of unlawful searches and arrests requiring desk lieutenants and unit commanders to review searches that appeared to be without legal justification and arrests that were unsupported by probable cause, and provided disciplinary measures for police officers who engaged in unlawful searches and false arrests. *Id.* at 800.

In *Roman*, the Third Circuit determined that at the pleadings stage, the plaintiff's allegations, along with the references to and content of the press release, newspaper article, and consent decree, were strong enough to survive a motion to dismiss. *Id.* In reversing the district court's dismissal of the plaintiff's complaint, the Third Circuit concluded, "viewing the pleadings and properly associated documents in the light most favorable to [plaintiff], there are claims plausible enough to withstand a motion to dismiss. We think there is one – the municipal liability claim. And the [district court] did not have to look beyond the amended complaint and supporting documents to glean these facts." *Id.* at 803.

### b. Application of the Foregoing to Johnson's *Monell*-Based Claims

This Court finds the reasoning of *Roman* to be particularly instructive, and will, based on the guidance provided in that decision, allow Johnson's *Monell*-based custom or policy and failure-

9

to-train claims to proceed at this time. With respect to Johnson's custom or policy claim, it is clear that Johnson has not pled an unconstitutional policy because her complaint fails to refer to an official proclamation, policy, or an edict. She has, however, sufficiently pleaded a claim for an unconstitutional custom.

As noted above, Johnson has specifically alleged that Officer Qirjako swung her into a wall and bench while she was in handcuffs at the police station. She alleges Qirjako cut her lip open, bruised her cheek bones, forehead, and the rest of her face, that she suffered from swelling all over her body, that her right arm was not fully functional for months, and, further, that she continues to experience sharp pains in her right shoulder. Johnson claims that Qirjako's actions were entirely unprovoked. She also claims that several officers witnessed this incident and refused to intervene. Johnson expressly claims that those officers failed to stop Qirjako because of the "customs [and] practices" within the Paterson Police Department concerning excessive force, and that these "policies, practices, and customs . . . were the moving force behind [her] injuries." D.E. 13 at 3.

Johnson's complaint also expressly references "[a]nnual reports filed by the Paterson police department [which] showed that the internal affairs division disposed of 93 excessive force complaints against city police officers from 2015 through 2019 and found that an officer did something wrong in one case, a rate of just about 1%." *Id.* This report suggests that Paterson may have had knowledge of similar unlawful conduct in the past, and that it has not taken precautions to prevent future violations. Johnson has therefore plausibly pled an affirmative link between Paterson's customs as they pertain to excessive force and the harm Johnson allegedly suffered. For these reasons, Johnson's factual allegations, coupled with her reference to the Paterson Police Department's excessive force reports, are strong enough to survive Paterson's Rule 12(b)(6)

motion to dismiss.  Paterson's motion to dismiss Count II, *i.e.*, Johnson's *Monell* custom or policy claim, is accordingly denied.

For similar reasons, Paterson's motion to dismiss Johnson's failure-to-train claim will also be denied.  Here, Johnson, in addition to the factual allegations detailed above, specifically avers that "Paterson failed to properly train or modify its training to Defendant Officers and its other officers, including but not limited to, matters related to the reasonable and appropriate use of force during [] arrests, and intervention in the excessive use of force by fellow officers."  *Id.* at 4.  Johnson bolsters her failure-to-train claim by making reference to: (1) the annual internal affairs reports discussed *supra*, and (2) a two-year audit of Paterson's police force completed by the Police Executive Research Forum in 2022 which found that the "Paterson department had out of date procedures, command structure and policies, including use of force" and that "the department has issues with training and needs to improve its use of force policies."  This information bolsters her failure-to-train claim.  *Thomas*, 749 F.3d at 223 ("Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train.").

The Court finds, based on the foregoing, that Johnson has also adequately pled a failure-to-train claim.  Thus, Paterson's motion to dismiss Count III, *i.e.*, Johnson's failure-to-train claim, will also be denied. *But see Kilgarriff v. Strunk*, Civ. No. 18-10120, 2019 WL 1434763, at *5 (D.N.J. Mar. 31, 2019) (finding that merely because the plaintiff was arrested and allegedly subjected to excessive force does not, by itself, provide a factual basis to support claims of a city-wide policy); *Guzman v. City of Newark*, Civil Action No. 20-6276, 2022 WL 1044957, at *9 (D.N.J. Apr. 7, 2022) (dismissing plaintiff's *Monell* claims as inadequately pled where Plaintiff failed to plausibly allege the existence of a custom or policy that resulted in his alleged

11

constitutional injuries, failed to provide any other specific factual allegations supporting the existence of such a policy, and his statements that the city's policies and customs constituted deliberate indifference to his constitutional rights were merely conclusory).

## IV. CONCLUSION

For the reasons above, Paterson's motion is **GRANTED in part** (as to Counts I and IV) and **DENIED in part** (as to Counts II and III).

Dated: November 1, 2022

_____
Evelyn Padin, U.S.D.J.